## Sarah Armfield *v.* Isaac Armfield *et al.*

Marriage is a valuable consideration in law, and the wife stands in the light of a *bona fide* purchaser, and is entitled to the same protection.

The claim of creditors is never an objection to the execution of marriage articles, unless they are creditors by judgment or other matter of record before the articles of marriage are entered into.

A husband made a settlement of two thousand dollars, or that amount of property, on his wife, in consideration of marriage. The wife selected certain slaves of the husband's in lieu of the two thousand dollars, and the slaves remained in the joint possession of the husband and wife. These slaves were levied on by virtue of an execution against the husband, obtained subsequent to the marriage settlement. Held by the court, that the slaves were not subject to the execution.

The bill of Sarah Armfield, formerly Gustavus, who sues by her next friend, states, that in March, 1825, she was courted by Isaac Armfield, and that, to induce her to marry him, he agreed to settle upon her, in money or property, exclusive of dower, the sum of two thousand dollars, and she makes an exhibit (A) of the articles of agreement to that effect; and that, in consideration of said agreement, she married him on the 24th March, 1825; that said articles of agreement were duly recorded, and that, at the time of making the same, and at the consummation of the marriage, the said Isaac was free from debt, and remained so for two years after.

The bill alleges that said Isaac has now settled the said sum of two thousand dollars upon complainant in money, but that, in 1834, he purchased two negro girls, which complainant then designated as the property which she would take in part fulfilment of said articles, to which said Isaac assented; that she was advised at the time that it was unnecessary to make any record of the understanding that existed between her and her husband; that she should take said negroes and retain them as her own, inasmuch as said article was believed to contain all that was necessary in law to perfect her title; and the said Isaac was only then indebted to a small amount, which was shortly after paid.

The bill further charges that this is the only payment complainant has ever received under said articles; that said Isaac has

made no other settlement upon her, and that he has no other property sufficient to pay her the said sum of $2000.

The bill alleges that, in 1839, the said Isaac became security for John Gustavus, upon two forthcoming bonds, one in favor of B. W. Rice, and the other in favor of Pearson & Taylor, which bonds were forfeited at the November term, 1839, of the Copiah circuit court; that executions issued upon said bonds, and were levied upon the two negro girls, and that they will be sold unless enjoined, &c.

The bill concludes with the usual prayer for injunction, subpœna, &c. and that said negroes may be decreed to be the separate property of complainant, to be taken by her at their reasonable value, in part payment of said sum of two thousand dollars; and, for the residue of said sum, prays a decree against said Isaac, &c.

On this bill an injunction was granted by the circuit judge, and a motion was made before the chancellor to dissolve the injunction for want of equity on the face of the bill.

JOHN B. COLEMAN for the motion.

Defendants, Pearson & Taylor, on whose behalf the motion to dissolve is made, are judgment creditors of Isaac Armfield, the husband of complainant, he having become security for one John Gustavus, upon a forthcoming bond in their favor, which was returned forfeited to the November term, 1839, of the Copiah circuit court. An execution issued upon said forfeited bond, and was levied upon two negro women, as the property of Isaac Armfield. These negroes are claimed by Mrs. Armfield to be her separate property, and she rests her title to them upon a marriage contract, by which, in consideration of their approaching marriage, Armfield settled upon. her two thousand dollars in cash or good property; and alleges that, Armfield having, in 1834, purchased the two negroes in question, and not having paid her the two thousand dollars, she elected to take them in part satisfaction of her claim under the marriage contract, to which Armfield assented. She admits that she took no steps to give any kind of publicity to this private arrangement, by which the property in the negroes was thus attempted to be transferred from her husband to herself.

It is submitted, that, upon complainant's own showing, the

Sarah Armfield *v.* Isaac Armfield *et al.*

' course she pursued was clearly insufficient to divest the title of her husband to the negroes, and to vest it in her; and that something more than a mere private understanding, by which she elected to take them, and he assented to that election, was necessary to work a change of title.

Although, where a marriage contract is *executory,* the wife is held in equity to be a creditor of the husband *pro tanto,* yet, whenever he undertakes, after marriage, to execute the contract, by making a settlement upon the wife, he must clearly indicate the precise property which he intends she shall take, and either settle it upon a trustee for her use, (which is as well the safest as the fairest course,) or distinctly separate it from the mass of his own property, and hold it himself as trustee for her benefit.    This position is fully sustained in Wallingsford *v.* Allen, 10 Pet. 583. The court there say that the husband may, during coverture, make a settlement upon the wife without the intervention of a trustee; but if he does, that he must distinctly separate the property settled upon her from the mass of his own.

In Clancy on Husband and Wife, 260, the doctrine is distinctly laid down, that the act by which the husband divests himself of his property must be clear and unequivocal—such as the transfer of annuities into his wife's name.

Again: on the same page, the author says, a gift from the husband to the wife by parol, without the intervention of a third person, will be received in a court of equity with great suspicion; and the court will expect satisfactory evidence of an act constituting a transfer of the property, and sufficient transmutation of possession.    A mere delivery to the wife (says the author) would not be a sufficient change of the possession to satisfy the court of the intention of the husband to divest himself of the property, because the possession of the wife is the possession of the husband.

In the present case, the act by which Armfield divested himself of his property in the negroes, (if, indeed, he can be said to have made any attempt to divest himself,) was neither clear nor unequivocal; and the court has certainly been furnished with no satisfactory evidence of any act of his constituting a transfer of the property, and sufficient (or indeed any) transmutation of possession.    He did not even go through the formality of delivering the

negroes to complainant, though this, according to the doctrine in Clancy, would have been insufficient, except in so far as it might have shown some disposition on his part to do something in the matter, of a more positive character than merely giving a passing assent to his wife's expression of her election.

The whole proceeding, then, as presented upon complainant's own showing, by which this change of title has been attempted to be brought about, resolves itself into a simple annunciation made by complainant to her husband in private, that she would take the two negroes in part satisfaction of her claim, and his equally private assent thereto; and whether that assent was given by a positive answer, a nod, or *sub silentio*, the court is not informed.

The facts, and the law as it is supposed to apply to these facts, which have been thus presented to the court, are conceived to be sufficient to sustain the motion to dissolve. There is, however, another aspect in which the case may be viewed, that is considered to be equally, if not more conclusive against the claim of complainant.

The doctrine is now well settled, that the possession of chattels continuing in the vendor after an absolute sale, raises a strong presumption of fraud, and in the absence of a satisfactory explanation, becomes conclusive. 5 Johns. 258; 2 Wend. 446; 17 Wend. 53; 8 Johns. 446; 15 Wend. 628; 5 Rand. 211.

The object of the law in requiring a change of possession to accompany an absolute sale of personal property, is to give to the world the same notice of the change of ownership, which upon a sale of land is effected by putting the conveyance upon record; so that persons subsequently dealing with the vendor, may be put upon their guard, and protected from any attempt on his part, either to sell the property to which he no longer has a title, or to obtain a fictitious credit upon the strength of his supposed ownership of it.

The reason of this rule of law is deemed to have a peculiarly apposite application to the present case.

Armfield purchased the negroes in 1834. From that time until the levy of Pearson and Taylor's execution, he had remained in undisturbed possession of them. Nothing during the whole

space of time that elapsed between the purchase and the levy, a period of more than eight years, was ever said or done, either by the complainant or Armfield, to furnish the slightest indication that any one but Armfield himself had any interest in or claim to these negroes.

Admitting, that in consequence of their relation as husband and wife, a change of possession was not necessary, and that it was competent for Armfield to settle these negroes upon complainant without the intervention of a trustee, as held by the court in 10 Pet., the very fact that no change of possession was to follow the change of title rendered it more than ordinarily imperative upon the parties, either to have put some evidence of the transfer of title upon record, and thus connected it with the original marriage settlement, or by calling around them their neighbors and friends as witnesses to the execution by Armfield of his contract, and its acceptance by his wife, to have given some show of publicity to the transaction.

Nothing of this kind was done or attempted. An impenetrable veil was thrown over the whole proceeding, and would doubtless have shrouded it until the present moment, had it not been raised or rent by the levy of defendants' executions.

Neither a creditor or an interested purchaser, by the most rigid examination he could have made, unless Armfield or his wife had thought proper to make the disclosure, would ever have been able to discover the slightest evidence, leading even to a suspicion, that complainant had any title to the property either legal or equitable. The marriage contract would certainly have furnished none. That instrument was executed in 1825 ; and in 1834, nine years afterwards, by a private understanding with her husband, without a single individual being called upon to witness it, she makes her election to take the two negroes in part satisfaction of her claim under the contract ; he assents to it, and the whole business is settled, without their ever saying a word about the price at which the negroes are to be estimated.

This may have been a perfectly fair and *bona fide* transaction; but if it were, it was about as well calculated to deceive purchasers and creditors, as the most fraudulent scheme that could have been devised. That it did deceive creditors is evidenced by the record

which the complainant has introduced. The property of Gusta-vus had been taken in execution. That property was released upon Armfield's becoming his security upon a delivery bond. Mrs. Armfield in her bill alleges in substance that the two negroes which she claims, constitute about the sum total of Armfield's pro-perty. Is not the inference then irresistible that Armfield was taken as security for Gustavus upon the faith alone of his supposed ownership of these very negroes?

Upon these views, the motion is respectfully submitted to the court.

B. HARRIS contra filed no brief.

THE CHANCELLOR.

Courts of Equity go very far to sustain marriage settlements, where they are just and free from the imputation of fraud. Mar-riage is a valuable consideration in law, and the wife stands in the light of a bona fide purchaser, and is entitled to the same protec-tion. Here the husband agreed to settle on the wife two thousand dollars, out of his estate, or to allow her to select property of that value which was thereafter to be held for her separate and ex-clusive use. Suppose that no election had been made by the wife of property in lieu of the $2,000. Do not the articles of settle-ment give her an equitable lien, upon the property of the husband to that extent, and would not a court of chancery enforce this equity against a subsequent judgment creditor of the husband? Mr. Atherly in his admirable treatise on the law of marriage set-tlements, page 130, says the claim of creditors is never an objec-tion to the execution of marriage articles, unless they were credi-tors by judgment, or other matter of record, before the articles were entered into.

Here the complainant relies upon an ante nuptial agreement, regularly proven and recorded as required by law, and it is appar-ent that the liability of the husband upon which his creditors ob-tained judgment, arose long subsequent to the marriage. I think no case can be found, sustaining the claim of a subsequent credi-tor against a settlement made before marriage. But here the com-plainant alleges that she elected to take the particular property

Sarah Armfield *v.* Isaac Armfield *et al.*

upon which the creditors have levied their execution, in part satisfaction of her claim under the articles of settlement, and that that election was made prior to the recovery of the judgment. She was at liberty by the terms of the articles to make such election, and having done so, her right to the slaves so elected, attached, and became perfect and complete; they were from thenceforth her separate and exclusive property, freed from all claim on the part of the husband, or those who might thereafter become his creditors. From this view of the case I am of opinion the motion to dissolve the injunction must be overruled.